AIMEE GREENE McCOMB

*v.*

WILLIAM McCOMB.

[Submitted November 18th, 1913. Decided March 3d, 1914.]

Evidence in a suit by a wife against her husband for a divorce on the ground of desertion, *held* to indicate an acquiescence on her part in their living apart until he could earn enough to support her.

*Mr. Thomas G. Haight,* for the petitioner.

*Mr. Marshall Van Winkle,* for the defendant.

GRIFFIN, V. C.

The petition in above cause is filed for a divorce on the ground of desertion. The parties, who were acquainted from childhood, were married October 15th, 1907. One child, a son named Galen, now aged about five years, was born of the marriage. At the time of the marriage the defendant was deputy city collector of Jersey City, receiving a salary of $1,500 a year. He was in receipt of no other income, had substantially no property, and relied wholly upon his salary for the maintenance and support of his family. Prior to the marriage the mother of the petitioner (a widow) very properly questioned the defendant as to his ability to support her daughter, and was informed by the defendant of his position and income; he said there was likely to be a change in the Jersey City administration; that he would probably lose his position; but had secured a better one in the health board. The petitioner was also advised of this situation.

After returning from their wedding trip, they occupied a house at Hackensack, the rent of which was $40 a month; the petitioner's mother, and son, aged about thirteen years, also resided with them and paid board. The defendant paid the first

two months' rent, lost his position on the 1st of January, 1908, did not secure the position in the health board, and after being for some time out of employment, secured a position in the Union Trust Company as a clerk on a salary of first $60 and later $75 a month.

In the course of his employment with the Union Trust Company he became acquainted with a business called the "wet wash business," and conceived the idea that it was very profitable. He told his wife that he was going to engage in it and here his lack of judgment and discretion is made to appear. He borrowed $600 from the Union Trust Company and invested it in the business, without making a reasonable investigation. His wife advised against this course until he made a proper examination of the business and consulted a lawyer on the subject. This advice he did not heed, with the result that within a very short time the wet wash business became a failure, the money embarked in the enterprise was lost, and he was driven to seek other employment.

His next venture was in a corporation which, with Mr. Mason, they formed for conducting the laundry business, called the M. & M. Laundry. He represented to his mother-in-law that it was a very good business, that ample money could be made in it, and borrowed from her $1,200. Afterwards, in the summer of 1909, and while he knew the business was running down and was virtually a failure, he borrowed from her an additional $1,000, on the representation that they were doing a splendid business, that the money was necessary to enable them to properly handle the same, and that he would repay her in a short time. On these representations the money was loaned; at the same time he borrowed $350 from his wife. During his stay in the laundry business he delivered to his wife checks in small amounts, made payable to the order of the M. & M. Laundry, which he, as president of the company, endorsed. She demurred to accepting them, thinking that it was suspicious, and inquired why the money was not put into the account of the company. He, however, allayed her suspicions. The day after Thanksgiving, 1909, he said he was going away, that the laundry business was doing nicely; that he was going with the knowledge and assent of Mr.

Mason; that Mr. Mason was to draw $25 and he $15 a week, and let it accumulate for the purpose of paying for the stock or dividends, that he had a good offer of a position at $40 a week at Belle Vernon, Pennsylvania. This story was absolutely untrue. It is apparent from the testimony that the creditors were pressing the company for payment, that he had taken those moneys which he gave his wife wrongfully, and having secured a position at Belle Vernon (not at $40 a week), suddenly departed, and within a few days afterwards his wife learned of the true situation in a conference with Mr. Mason. When defendant reached Pittsburgh he telegraphed his wife, and wrote her, enclosing all the money he had, $5. His position at Belle Vernon was that of a solicitor of bank accounts, for which he received $10 a week, and a commission on all over and above a certain sum deposited through his solicitation. At Belle Vernon, he says, he averaged $15, $18 and $20 a week, and sent his wife $10, $12 and $15 every week, being all he made excepting about $4 a week which he paid for his board. He next went to Masontown. From Masontown he went to Rockingham, North Carolina, then came back to New Jersey from Rockingham. He says that from all these places, down to the time he left Rockingham and returned to Hackensack, he sent his wife from $10 to $15 a week. He returned to Hackensack in March, 1910. He found that during his absence the dining-room had been closed up and was used for boarders; and he says that his wife said to him during the night, "You can stay here, if you want to, but you can have the room in the attic; that is the best I can do for you;" and he said, "What is the matter with our room?" "Oh," she said, "Mother sleeps with me." He did not stay there that night, but left somewhat offended, he does not recall when he returned to Hackensack. He lived in Jersey City for two weeks after his return but did not visit at her home during that time but telephoned that he wanted to see her. They met by appointment on Montgomery street, Jersey City. He did not further communicate with her unless, perhaps, by letter. He says that when he came back from Rockingham, North Carolina, this time, in March, his wife met him, that he looked very shabby; they went to Rogers, Peet & Company and she bought him a suit of clothes

so that he might take a managership. He was next employed as manager by the same company, the Burns Company, in the same business of soliciting bank accounts, at a salary of $25 a week; and he says he sent her $20 a week; that this continued so long as he was a manager. He was next sent to Mt. Jackson, Virginia, and from there sent her $20 a week; from there to Henderson, North Carolina, where business was not good; and it appears from the correspondence that his wife was willing to join him there, but he inquired of the Burns Company for assurances about his staying South as manager (because, he says, he did not want to bring her down on a fool's errand), and they could give no assurances, thereupon he advised her not to come. While at Henderson his board cost him $7 a week, the balance he sent to his wife. He returned to Hackensack in July, 1910. He says Mrs. McComb did not object to his going away, and she bought him a suit of clothes to go away as manager. She knew his plans. He says it was on this visit in July that his wife told him he could have a room in the attic, but his testimony leaves it in doubt whether it was in March or July he was asked to sleep in the attic, and she bought him the clothing. He next entered the service of the Bankers Corporation, in the same line, at Mt. Vernon, New York, where he remained until September 21st, 1910. During this period of service he made $12, $15, $18 and $20 a week, and sent it to his wife, outside of what he had to pay for board. During the month of August, 1910, while he was so employed, the petitioner's mother was not at home, and the defendant visited petitioner on week-ends, and they cohabited and were on friendly relations. From August, 1910, down to the date of the filing of the petition, the parties had no sexual relations. After leaving the Bankers Corporation he was employed by the Aetna Life Insurance Company on Long Island, during the month of September, 1910, receiving $20 a week, and paid it to his wife, excepting what he paid for board, he living with his parents in Jersey City. He next worked for his brother-in-law, Alfred Lewis, in the dairy products business, until December, 1910, receiving $15 a week, all of which he gave to his wife, his compensation being $15 a week and board. He says he left his

brother-in-law in December, 1910, obtaining employment in Winston-Salem, North Carolina, from the Burns Company as solicitor, and was there until January 18th, 1911, earning $12, $15, $18, $20 and $25 a week, paid his board, and sent the balance to his wife. From Winston-Salem he went to Roxborough, North Carolina, for the same concern, in the same line of business, and earned from $12 to $18 a week, and stayed there until February 10th, 1911, and sent the money that he earned to his wife as before. Leaving there he came back to Jersey City, worked for his brother-in-law until the latter end of April, 1911, at $15 a week and board, and sent all of his wages to his wife. About February, 1912, or shortly prior thereto, he went into business for himself. From that time down to January, 1913, he was in the cigar business and milk business (see *Exhibits P 31, 32* and *37*). In this last letter, which was written in October, 1912, he says he is in the cigar business and was particularly unfortunate "this summer and did not have any money to send." He did, however, send some money, as appears by the exhibits; and it also appears that he did not visit her from December, 1911, until November, 1912, the visit at this latter time being brought about by a letter to him from his wife saying that she was going to Suffern, and offering to come down to meet him if he should write. He telegraphed, and she returned from Suffern and met him on the 6th or 7th of November. The conversation at this meeting was like most of the others, simply talking about the future and about his earning possibilities and nothing came of it. About January, 1913, he was in the milk business, and said he was making from $12 to $15 a week, with two or three hundred dollars invested. He sent some money to his wife during this month, and said he ceased sending her money during the baby's illness, which was the latter end of January, or the early part of February, 1913, because he learned that the baby was ill, and the doctor had ordered that no one be admitted to see him. She had asked the doctor if Mr. McComb could not see the child, and he said "No, under no circumstances." The defendant then wrote to his wife, saying that, regardless of the doctor's orders, he would see his child; she then wrote back (*Exhibit D 1*) saying, "The doctor's orders *must be obeyed.* You

must not annoy me further." This last letter, it appears, so incensed him that he stopped sending money.

The petition was filed within a month thereafter.

Aside from the foregoing, other facts appear which shed some light on the case. The petitioner says that on a visit to her about Labor Day, 1910, the first thing he said was,

"I will send you some money; I have consulted my lawyer, and you will never get a divorce from me. I will send you some money from time to time, and, if necessary, have it registered. He told me that."

She, in reply, said she did not want a divorce. He denies that he ever spoke to her about a divorce or that he consulted a lawyer until this suit was brought. Owing to his admitted untruthfulness in dealing with his wife and her mother, and the fact that he did send her a registered letter, which he says was sent so that he could have something to fall back on in case anything happened, which might naturally be taken to mean, if his wife applied for a divorce, I am inclined to the belief that the petitioner is telling the truth. Prior to leaving the laundry business, which was in November of 1909, she learned that her husband owed money to the Glen Island Hotel, which she said was a notorious resort, and her suspicions were aroused. Taking these suspicions in 1909, and his statement as to how he would prevent her from obtaining a divorce, made about October, 1910, into consideration, she consulted a lawyer some time in July, 1911, and laid the circumstances before him, acting upon whose advice she employed a detective to follow defendant and only discontinued his services because her funds gave out. She kept copies of her letters written to him, as well as his letters to her, after this date, because of her lawyer telling her to be very careful. The married life of the petitioner down to this date having been so unsatisfactory, with such little hope of betterment in sight, I am inclined to believe she then conceived the idea of obtaining a divorce if conditions did not improve. The defendant explains that the bill referred to was contracted on the day of the Hudson-Fulton celebration, when he went into the hotel with a number of friends hoping to secure all the laundry work of the hotel.

Some of the letters which she offered in evidence she says were shown to her lawyer before they were sent, others were not. While the defendant was wandering throughout the country in an effort to make money, his wife and child, during the summer, were at Asbury Park, and sometimes, in the spring and fall, at Foxwood Inn, Suffern, New York. It is very apparent that the defendant was practicing a great deal of self-denial, and endured a great deal in keeping away from the society of his friends in his travels through Pennsylvania, Virginia, North Carolina and New York, seeking to earn money, all of which, outside of his bare means of support, he sent her. This rather indicates quite some love and affection for his wife and child. Another fact seems to not only demonstrate this, but also that this love was reciprocal, appears in two letters (*Exhibits P 33* and *P 34*) which passed between the parties in April, 1912, less than a year before this petition was filed, the defendant wrote enclosing a receipt for premim on $1,000 policy in the Prudential, and said:

"I have taken an additional $2,000 (policy), the quarterly payment of which falls due on July 15th, Galen's birthday. Should anything happen to me, you will collect $3,000, as everything is payable to you,"

to which she replied, saying:

"I sincerely hope that I shall never be the one to profit by it. You know you have many tasks to perform yet, and it is our ambition, or should be, to live until we have done them well."

While before his marriage, and for some time afterwards, his conduct towards the petitioner was rather reprehensible, he seemed to be filled with a desire to do his best for his family. But he says that the constant talk in the house when he went to Hackensack was "money, money, money," which was very annoying. I think perhaps he exaggerates this, yet, under the circumstances, it was but natural that there should have been some talk of money matters that made it rather disagreeable to him, considering the large amounts of money of his mother-in-law and wife he had squandered in such a short time, and afterwards finding how difficult it was, in open competition, to earn a livelihood. But it did not excuse his failure to visit his wife while

18

he was in business at North Arlington and living at Jersey City and Nutley for a period beginning with December, 1911, and ending with November, 1912.

The whole aspect of the case is peculiar. The petitioner contends that the desertion commenced in October, 1910; that at that time he had a deserting mind, that this is evidenced by the fact that he told her, two weeks after Labor Day of 1910, that she would not get a divorce because he had consulted a lawyer, and would send her money which would defeat it. If his intent at that time was to desert his wife and never afterwards resume marital relation, the mere fact that he sent her money would not of itself prevent a decree being entered against him; the mere sending of money to a wife does not constitute the full measure of duty which a husband owes to his wife. His desertion could be willful, and yet he might support her. The strange part of the case, however, is that while he was with the laundry company he actually took about $300 of the company's funds and gave it to his wife for her support. It is unlikely that he would do this if he was not anxious to care for her. On these various trips he sent her virtually all he earned, less a sufficient sum to pay his board. He did not even have money to buy clothing, and was reduced to such a degree that when he came to New York from Roxborough to become a manager, his wife took him to Rogers, Peet & Company and bought him clothing. If he was carrying out a preconceived design of sending her money for the purpose of defeating a divorce, he certainly punished himself severely to accomplish this end. He might readily have sent less and fully subserved the purpose intended. I can hardly believe this. I think he endeavored to do the best he could, but, by reason of some mental characteristics, which are evidenced a great deal in his letters, he seemed incapable of acquiring a position to properly care for his wife and child; some of these characteristics appear plainly in his letters; they are filled with the most exaggerated statements as to his earning capacity and the money he was making. They were filled with such expressions as that he was "making a barrel of money," and he explained that the reason why he wrote such things to his wife was that he desired to buoy her up and make her cheerful.

Some of his letters, however, are rather harsh. About August, 1911, he wrote the letter (*Exhibit P 21*), in which he told her, after saying that he loved and thought of her all the time, and wanted her to be with him, and that he wished her to come and live with him, he says, "I will provide the very best I can for you and my baby. Your answer must be 'yes' or 'no,' as my future actions will depend on your reply." This letter was registered, and is apparently the only registered letter he ever sent her. To this letter she replied on August 8th, 1911. (Prior to which time, July, 1911, she had consulted a lawyer.)

In her reply she pointedly asked him why he registered the letter when it contained no money and he had never sent her a registered letter before, even letters that contained money, his explanations were rather lame, thus provoking comment on the fact in her subsequent letters. It is apparent that the registry of the letter taken in connection with his previous statement, as to the manner in which he would prevent her from obtaining a divorce, conveyed to her the idea that the letter was registered with the same end in view.

On the stand he testified that he determined to write the letter to have something to fall back upon in case anything happened.

While it has not been testified to, I am inclined to the belief that the defendant wrote this letter for use in case his wife should sue for divorce, that it must have been in his mind that his absence might amount to a desertion. He says, however, he did not consult a lawyer about the matter and was not advised until this suit was brought. It appeared that the defendant wrote his wife that he would secure an apartment, and, at another time, that he would secure quarters in a boarding-house. Her letters indicate an acquiescence in these plans, which he then abandoned, saying, he could get neither the apartment nor the boarding-house. He says the reason why he could not get them was that when he went to Hackensack to see his wife, her talk was different from her letters. She also says that his talk was different from his letters, and so the parties did not resume marital relations. I am satisfied that if the defendant was earning sufficient to enable them to live in substantially the style

adopted by them at the time of their marriage, or in somewhat inferior style if there was any certainty as to its continuance, this proceeding would never have been brought.

She had lived hoping for the arrival of the day when he would be capable of properly caring for his family, and this continued down to the date of the illness of their son, Galen, in January or February, 1913, during which he, becoming incensed at not being permitted, against the doctor's orders, to see his child, stopped sending her further moneys. When it is considered that this man for a whole year lived within a few miles of his child and did not make an effort to see him, it is plain that his conduct on this occasion was absolutely unjustifiable, and was properly so looked upon by his wife. This, to my mind, completely weaned her love for him, and she then finally concluded to put into effect what, for a long time, was inchoate in her mind, restrained only by her hope and love, to seek a divorce. But I am unable to determine at what particular period it can be said that a desertion commenced. She consented to his leaving on these various trips. She bought clothes for him to go as manager on one of the trips. Her letters, after his undertaking this latter trip, were substantially of the same tenor as before. There is nothing in the letters written by or to him during two years prior to the filing of the petition, or even down to the date of the filing of the petition, nor is there anything in the testimony, as I read it, which could, in any manner, be treated as information to the defendant that the wife demanded a resumption of marital relations. These letters and the evidence indicate an acquiescence in their living apart until he could earn enough to support her. *Provost* v. *Provost, 71 N. J. Eq. 204;* affirmed, *73 N. J. Eq. 418; Foote* v. *Foote, 71 N. J. Eq. 273; McAllister* v. *McAllister, 71 N. J. Eq. 18.*

I am constrained to decree that the bill be dismissed.